Muhammad **BADWAN,**
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

**No. 75–1343.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted March 22, 1976.

Decided Sept. 7, 1976.

Rehearing Denied Oct. 14, 1976.

Richard C. Lonnquist, of Hoffman, Goldstein, Armour & Lonnquist, Denver, Colo., for plaintiff-appellant.

Douglas D. Doane, Asst. U. S. Atty. (James L. Treece, U. S. Atty., Denver, Colo., on the brief), for defendant-appellee.

Before LEWIS, Chief Judge, SETH, Circuit Judge, and MORRIS, District Judge.[*]

LEWIS, Chief Judge.

The facts in this case may be simply stated. Azmai Badwan was the operating manager of a small food store in Denver, Colorado. Between 40 and 50 percent of the store's sales were paid for by customers using government food stamps. Plaintiff Muhammad Badwan owned the store but spent the greater part of his time at other stores owned by him. The Badwans were cousins.

On April 21, 1971, an agent of the Department of Agriculture, O'Keefe, approached Azmai, who was then at the check counter, and asked Azmai if he was the owner. Azmai (Tony) replied that he was not and that Mike (plaintiff) was co-owner but was not then in the store. O'Keefe said he had some food stamps for sale and asked when Mike would be in. Tony replied that Mike would be in about 9:00 a. m. the following day. O'Keefe then left.

O'Keefe returned the next day and in his testimony described the ensuing events:

Q. Did you come back the following day?

A. Yes, sir.

Q. What took place then?

A. About 9:20 the following morning, I entered the same store, American Way Market, and the same individual, Tony, was behind the checkstand. He was alone and I approached him. I said, "Is Mike here yet?" and he said, "No." So I probably said "Do you mind if I wait?" I did wait. We had no further conversation for at least four or five minutes. I stood around and waited for Mike.

Q. Did Mike ever come in?

A. He did eventually, but not until we had further discussion.

Q. What further discussion did you have?

A. After I was there four or five minutes standing around waiting for Mike, Tony—he had been eyeing me, looked over and said, "You got the food stamps with you?" and I said, "Yes, I have got $120.00 worth in $5.00 books, four books." When he said, "How many?", I don't remember whether he said may I see them, but he wound up with them in his hand and started to count them and he asked me how much I wanted, and we had a little discussion, I would call it. I said I normally got at least 50% of the value. In other words, I wanted $60.00 and he never did hand them back to me, but after that statement was made, there was at least a full minute of contemplation by Tony, and he finally said, "I will give you 55," and I contemplated myself for a moment or two and accepted the offer of $55.00, and he completed the transaction in which I gave him $120.00 worth of stamps and he gave me $55.00 in currency.

Q. Do you recall where he took the money to pay you the $55.00?

A. Yes, he removed the money from a large roll of currency in the right-hand

* Chief Judge of the United States District Court for the Eastern District of Oklahoma.

trouser pocket and peeled off two 20's, a 10 and a 5 for $55.00.

Q. Now, you said that you sold him some food stamps. Did you in any way mark these stamps?

A. Yes, sir, they had been marked prior to my entry into the store.

.    .    .    .    .

Q. Did you have any further conversation or transactions at American Way on this particular day?

A. No, sir.

Q. You then left the store?

A. After a very brief conversation I discussed the transaction between Tony and me and I immediately following thereto, I asked Tony if he would be interested in any more and he said come back next week and about that time he looked over my shoulder at the entrance to the door and said in a low undertone "There is Mike now. Don't say anything. Keep quiet." Or words to that substance. "There is Mike now. Say nothing." I left. As I said, I said, "See you Tony" and said hi to an individual coming in the door.

Plaintiff testified that he knew nothing of the transaction until he read newspaper reports and received a letter from the Department of Agriculture. He then confronted his cousin Azmai, who admitted the purchase and the fact that he had later put the subject stamps in the store cash register and had pocketed $120 in cash. Plaintiff immediately fired Azmai.

The only other witnesses testifying established the fact that the stamps were redeemed (and spotted) in routine procedure.

An administrative proceeding followed and the store was disqualified for a period of one year from the food stamp program pursuant to 7 U.S.C. § 2020:

> Any approved retail food store or wholesale food concern may be disqualified from further participation in the food stamp program on a finding, made as specified in the regulations, that such store or concern has violated any of the provisions of this chapter, or of the regulations issued pursuant to this chapter.

.    .    .

Following a de novo trial the district court reached the same result, holding that a violation of the program was established and that personal knowledge of or participation in the violation by the owner was not a necessary factor premising valid disqualification under the program. The court's reasoning was based primarily on *Welch v. United States,* 4 Cir., 464 F.2d 682, and *Martin v. United States,* 6 Cir., 459 F.2d 300, *cert. denied,* 409 U.S. 878, 93 S.Ct. 129, 34 L.Ed.2d 131.

These decisions cited by the trial court resulted from the application of generally accepted methods of factually determining the existence of agency. In each of these cases the violation resulted from check-out stand operators erroneously receiving food stamps for ineligible items such as liquors, foreign-made foods, etc. Of course, the store receives a benefit from selling ineligible items and would register a profit on that volume. The nature of these violations and the circumstances under which they occurred give ample license to a factual finding of agency. This factual finding furnishes the basis on which those courts could hold the personal knowledge or participation of the owner is not required for disqualification of a store. However, we are not persuaded that the justifiable impact of the cited cases must dictate the result reached by the trial court in this case.

We recognize that administration of the food stamp program is inherently difficult, that the program's worthy purpose can easily be thwarted by fraud or even a level of a much lesser degree of non-compliance, and that punitive sanctions are necessary for enforcement. However, the coin has two sides and courts should not abandon their traditional function of giving very close scrutiny to situations involving the tortious or criminal actions of employees nor too readily infer agency as a premise for imposing sanctions in such cases. Restatement (Second) of Agency § 34, comment g (1958).

In the case at bar Azmai Badwan's violations of the Act are on an entirely different plane than erroneously receiving food stamps for ineligible items. Under 7 U.S.C. § 2023(b) his actions constitute a felony:

Whoever *knowingly* uses, transfers, acquires, alters, or possesses coupons or authorization to purchase cards in any manner not authorized by this chapter or the regulations issued pursuant to this chapter shall, if such coupons or authorization to purchase cards are of the value of $100 or more, be guilty of a felony and shall, upon conviction thereof, be fined not more than $10,000 or imprisoned for not more than five years or both  .  .  . .

(Emphasis added.) The only reasonable inference from the evidence is that the crime was actively concealed from the store's owner. The actions of Azmai were to his own advantage and to the disadvantage and detriment of his employer, the American Way Market. This delict was not the result of improper training, inadequate explanation, or negligent supervision of employees but the result of a single employee's criminal intent. We are convinced that the record reflects a criminal frolic of Azmai's and that the inference of responsibility placed on plaintiff is not justified.

The case is reversed with instructions to enter judgment in favor of plaintiff.