**R RANCH MARKET CORPORATION, doing business as R Ranch Market # 2; Omar O. Shalabi; Jose Shalabi; and Farid Shalabi, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 87–6404.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 5, 1988.

Decided Nov. 10, 1988.

James L. Kellner, Gardena, Cal., for plaintiffs-appellants.

Robert C. Bonner, U.S. Atty., Frederick M. Brosio, Jr., Asst. U.S. Atty., Asst. Chief, Civ. Div., and Diane Bardsley, Asst. U.S. Atty., Los Angeles, Cal., for defendant-appellee.

Before HUG, POOLE and THOMPSON, Circuit Judges.

POOLE, Circuit Judge:

R Ranch Market Corp. ("R Ranch") appeals from the district court's judgment affirming the Food and Nutrition Service's decision to permanently disqualify R Ranch Market # 2 from participation in the food stamp program. The sole issue on appeal is whether a retail food store may be permanently disqualified without a showing that the owner either had knowledge of or participated in the predicate violation. We hold that the government must show that the predicate acts were taken for the benefit of the employer, and we therefore reverse the decision of the district court.

## FACTS AND PROCEEDINGS BELOW

R Ranch Market # 2 is a retail grocery store doing business in Santa Ana, California. The R Ranch Market Corp. is owned by three shareholders: Omar, Jose and Farid Shalabi. Only Farid manages and takes an active part in the operation of R Ranch # 2. R Ranch # 2 was authorized to participate in the food stamp program beginning in 1982. Program authorization required R Ranch to acknowledge that authorization could be revoked based on program violations committed "by any of the firm's employees."

In 1985, the Department of Agriculture's Food and Nutrition Service (FNS), which administers the food stamp program, began to suspect that R Ranch # 2 might be violating program regulations. Accordingly, the Inspector General conducted an investigation of R Ranch # 2's food stamp redemption practices. According to the investigative report, four instances of "trafficking"[1] in food stamp coupons occurred: one on June 5, 1985, with an unidentified Hispanic male, and three on August 12, October 24, and November 21, 1985, with a security guard identified as "Dan",[2] and an employee named Ragy, a cousin of the Shalabis. However, the investigative report also reveals that when Farid Shalabi was himself approached on May 30, 1985, he refused to accept stamps for ineligible items, and he warned the investigator that "she could get into trouble trying to buy beer and other items and that [she] should carry her [food stamp] ID card." C.R. 4 at 39.

Pursuant to 7 U.S.C. § 2021 (1982) and 7 C.F.R. § 278.6(e)(1) (1987), FNS permanently disqualified R Ranch # 2 from partic-

---

1. "Trafficking" is defined as "the buying or selling of [food stamp] coupons ... for cash." 7 C.F.R. § 271.2 (1987).

2. Plaintiffs submitted affidavits to the FNS that they had never employed anyone named Dan or anyone meeting the description of the unidentified Hispanic male. However, subsequent affidavits of the investigators stated that the security guard's last name was Murray, and that his first name was inaudible on the tape. The security guard employed by R Ranch # 2 was named Wilbur Murray.

ipation in the food stamp program, based on a finding that two employees of R Ranch # 2 had "trafficked" in food stamp coupons. On January 8, 1987, R Ranch filed this action seeking review of the disqualification order pursuant to 7 U.S.C. § 2023(a) (1982). After the district court denied a stay of the order pending review, the parties submitted the case to the court on stipulated facts,[3] asking for a determination on a single dispositive issue of law: whether the FNS could permanently disqualify a store without showing knowledge of or participation in the predicate violation by the store's owners. On August 24, 1987, the district court determined the issue in favor of the government and entered judgment. R Ranch timely filed this appeal.

## STANDARD OF REVIEW

The review provision of the Food Stamp Act provides that review of the validity of an administrative action shall "be a trial de novo." 7 U.S.C. § 2023(a) (1982). The agency action is also subject to the more general provisions of the Administrative Procedure Act, which provides that a reviewing court shall "hold unlawful and set aside ... conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (1982); cf. Bertrand v. United States, 726 F.2d 518, 520 (9th Cir.1984) (FNS sanctions reviewed under arbitrary and capricious standard); Modica v. United States, 518 F.2d 374, 376 (5th Cir.1975) (de novo review provision is "clearly broader" than the review standard under the APA). "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706 (1982).

**3.** The stipulation reads: "For purposes of briefing, determination and appellate review (if any) of the legal issue, plaintiffs do not dispute that (1) two of plaintiffs' employees committed violations of 7 U.S.C. § 2021 and governing regula-

When reviewing an agency's construction of the statute it administers, the court must first give effect to the unambiguously expressed intent of Congress. *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If the statute is silent or ambiguous with respect to the specific issue, then the court is limited to considering whether the agency's interpretation is based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. at 2782. However, "an agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987), quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981).

## DISCUSSION

Disqualification of a retail food store is authorized by 7 U.S.C. § 2021, which provides:

Any approved retail food store or wholesale food concern may be disqualified for a specified period of time from further participation in the food stamp program, ... on a finding, made as specified in the regulations, that such store or concern has violated any of the provisions of this chapter or the regulations issued pursuant to this chapter.

7 U.S.C. § 2021(a) (1982). Prior to 1982, the period of disqualification was left to the agency's discretion, and the applicable regulations provided for a range of disqualification periods between 30 days and 3 years. 7 C.F.R. § 278.6(e) (1982). In 1982, however, Congress amended the statute to provide mandatory statutory penalties of greater duration:

Disqualification under subsection (a) of this section shall be—

tions by purchasing food coupons for cash at discounted value; and (2) the purchased food coupons were redeemed through plaintiffs' bank account."

(1) for a reasonable period of time, of no less than six months nor more than five years, upon the first occasion of disqualification;

(2) for a reasonable period of time, of no less than twelve months nor more than ten years, upon the second occasion of disqualification; and

(3) *permanent upon* the third occasion of disqualification or *the first occasion of a disqualification based on the purchase of coupons or trafficking in coupons* or authorization cards *by a retail food store* or wholesale food concern.

7 U.S.C. § 2021(b) (1982) (emphasis added).

Because a "retail food store" can only act through its employees, it is apparent that some kind of *respondeat superior* liability must attach if the statute is to have any meaning at all. The FNS has undertaken to define the scope of that liability in its regulations. Prior to 1982, the applicable regulation defined a "firm" as "the ownership or management of an authorized retail food store ... or any person acting on behalf of the ownership or management." 7 C.F.R. § 278.6(a) (1982). However, the regulations issued to implement the 1982 amendments deleted this provision, providing instead for permanent disqualification when any "[p]ersonnel of the firm have trafficked in coupons." 7 C.F.R. § 278.6(e)(1)(i) (1987). Because the extent of a store's *respondeat superior* liability is not specifically addressed in the statute, the issue for decision is whether this regulation is "based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. However, since the current regulation is inconsistent with the former regulation concerning this matter, we must bear in mind that it is entitled to "considerably less deference" than would otherwise be the case. *Cardoza–Fonseca,* 107 S.Ct. at 1221 n. 30.

■ In our view, the challenged regulation cannot stand. The sanction of permanent disqualification is a draconian penalty, and we are reluctant to infer that Congress intended to impose such a sanction on an unknowing employer absent a clear indication that such was Congress' intent. No such indication appears here. In enacting the 1982 amendments, Congress acted only to increase the penalties for program violations. Congress was presumably aware of the existing regulation, which required that an employee act "on behalf of the ownership or management," and the existing case law, discussed below, which required that an employee act for the benefit of the employer, and it did nothing to change those constructions or to disapprove of them in any way.[4] In addition, the regulation fails to further the purposes of the statute. Congress' express purpose in mandating increased penalties was "to provide * * * deterrence for those stores which might be inclined to violate the law." S.Rep. No. 504, 97th Cong., 2d Sess. 64, *reprinted in* 1982 U.S.Code Cong. & Admin.News 1641, 1702. However, the goal of deterrence is not served by imposing sanctions on an employer who had no knowledge of and did not benefit from the predicate violations. To the extent the regulation permits such liability to be imposed, it must be deemed to be arbitrary and capricious.

The government argues that enforcement of the Act would be rendered nearly impossible without the bright-line rule that the regulations provide. *See PTF Enterprises, Inc. v. United States,* 558 F.Supp. 1317, 1319–20 (W.D.Mo.), *aff'd without opinion,* 716 F.2d 908 (8th Cir.1983). This argument was squarely rejected by the Tenth Circuit in *Badwan v. United States,* 541 F.2d 1388 (10th Cir.1976), where the court stated:

We recognize that administration of the food stamp program is inherently difficult, that the program's worthy purpose can easily be thwarted by fraud or even

---

**4.** The government correctly points out that the criminal provisions of the Act impose liability on any person who "knowingly" violates the regulations, 7 U.S.C. § 2024(b)(1) (1982), and it urges us to draw a negative implication regarding the section at issue. We are not persuaded by this argument. Section 2024 speaks only to the liability of an *individual;* it does not negate traditional *respondeat superior* principles in determining the liability of a corporate employer.

a level of a much lesser degree of non-compliance, and that punitive sanctions are necessary for enforcement. However, the coin has two sides and courts should not abandon their traditional function of giving very close scrutiny to situations involving the tortious or criminal actions of employees nor too readily infer agency as a premise for imposing sanctions in such cases. Restatement (Second) of Agency § 34, comment g (1958).

541 F.2d at 1390.

We find the rationale and holding of the Tenth Circuit to be persuasive on this issue. In *Badwan*, a clerk bought food stamp coupons at a discount from a government investigator with cash from his own pocket, then later deposited the coupons in the register and pocketed their face value in cash. The clerk specifically told the government investigator not to say anything to the owner. Upon learning of the violation, the owner immediately fired the clerk. The Tenth Circuit held that because the act was actively concealed from the owner, and was for the employee's own advantage rather than for the advantage of his employer, the owner could not be held responsible. 541 F.2d at 1391.

We recognize that two subsequent cases in the Tenth Circuit have limited *Badwan*'s holding, but neither of those cases rejects the proposition that a store owner should not be held responsible where he did not know of or benefit from the predicate violation. In *Wolf v. United States*, 662 F.2d 676 (10th Cir.1981), the court held the store responsible for the actions of its cashiers in accepting coupons for non-food items. The court stated that "[i]n accepting the food stamp coupons, the checkers intended to benefit the store," and it distinguished *Badwan* as involving a single employee who trafficked "for personal gain and without the knowledge of the store manager or owner." *Id.* at 678. In *Joudeh v. United States*, 783 F.2d 176 (10th Cir.1986), the court relied on the regulation defining a "firm" as "any person acting on behalf of the ownership or management," in holding the store owner responsible for the acts of his two brothers, who were managerial employees. *Id.* at 179–80. The court also

specifically approved the district court's finding that Joudeh, the store owner, "did not exercise sufficient supervision of his employees and that he was negligent in that respect," *id.* at 181, distinguishing *Badwan*, where the court had emphasized that the owner had not been negligent. *Id.* at 180; *see also Badwan*, 541 F.2d at 1391.

Two other circuit courts have held that a food store is liable under the statute for the acts of any employee, regardless of the owner's knowledge or participation. *J.C.B. Super Markets, Inc. v. United States*, 530 F.2d 1119, 1121–22 (2nd Cir.1976); *accord, Kulkin v. Bergland*, 626 F.2d 181, 183 (1st Cir.1980). However, both cases involved a cashier accepting coupons for non-food items, an act held to be within the scope of the employee's authority. *J.C.B.*, 530 F.2d at 1122. *Kulkin*, 626 F.2d at 182–83. Again, we find the rationale of *Badwan* persuasive in distinguishing these cases:

> These decisions ... resulted from the application of generally accepted methods of factually determining the existence of agency. In each of these cases the violation resulted from check-out stand operators erroneously receiving food stamps for ineligible items such as liquors, foreign-made foods, etc. Of course, the store receives a benefit from selling ineligible items and would register a profit on that volume. The nature of these violations and the circumstances under which they occurred give ample license to a factual finding of agency. This factual finding furnishes the basis on which those courts could hold the personal knowledge or participation of the owner is not required for disqualification of a store. However, we are not persuaded that the justifiable impact of the cited cases must dictate the result reached by the trial court in this case.

541 F.2d at 1390.

We emphasize that our construction of the statute will not shelter an employer who adopts a "see no evil, hear no evil" policy of non-supervision over his employees. *See Rivera v. United States*, 630 F.Supp. 35, 41 (E.D.Pa.1985). Rather, our holding is consistent with our prior state-

ment that "[a]n employer can be penalized for violations of its employees, but not when it has done everything possible to insure compliance by them." *Plaid Pantry Stores, Inc. v. United States*, 799 F.2d 560, 566 (9th Cir.1986), *aff'g* 612 F.Supp. 680 (D.Or.1985). While this statement was made in a case where the regulation required a showing of "carelessness or poor supervision by the firm's ownership or management," *id.; see* 7 C.F.R. § 278.6(e)(5) (1987), we believe that the principle is equally applicable to the case in which the employee acts solely for his personal gain and actively conceals his conduct from the owner. Neither the statutory language nor the legislative history supports the imposition of a punitive sanction in such a situation.[5]

In the instant case, there is evidence from which it could be inferred that the employees involved were acting on behalf of, or for the benefit of, the owners. However, there is also evidence supporting appellants' position that the employees were acting for their own benefit without the knowledge of the owners.[6] As an appellate court, we are not free to resolve this factual issue. *See United States v. Semenza*, 835 F.2d 223, 225 (9th Cir.1987). We therefore reverse the judgment of the district court and remand for a trial *de novo*, pursuant to 7 U.S.C. § 2023 (1982).

REVERSED AND REMANDED.

---

**5.** The government also argues that the sanction of permanent disqualification is not unduly harsh because a *store*'s disqualification will not automatically prevent authorization of other stores with common ownership. However, one court has noted that the FNS has taken inconsistent positions with respect to this issue. *See Abdelaziz v. United States*, 837 F.2d 95, 96–98 (2nd Cir.1988) (upholding permanent disqualification of individual owners). In addition, the statute provides that an owner remains disqualified even after he transfers ownership of the store. *See* 7 U.S.C. § 2021(e)(1) (Supp. III 1985) ("The disqualification period ... shall continue in effect *as to the person or persons who sell or otherwise transfer ownership* of the retail food store ...") (emphasis added).

**6.** The district court relied on the stipulation that the purchased food stamp coupons were redeemed through R Ranch's bank account in distinguishing *Badwan*. C.R. 15 at 3–4. However, the district court's conclusion does not follow from the stipulation. If, as in *Badwan*, the employees had bought the stamps with their own cash and surreptitiously exchanged them for their face value in cash from the register, the coupons would still have been processed through R Ranch's bank account, but the transaction would have benefitted only the employees, not the store.