**David CARLSON, d/b/a Liberty Supermarket, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 88–2866.

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1989.

Decided July 7, 1989.

Susan G. Feibus, Chicago, Ill., for David Carlson dba Liberty Supermarket.

Mark A. Flessner, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Nancy K. Needles, Asst. U.S. Atty., Chicago, Ill., for U.S.

Before CUDAHY, COFFEY, and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

This case centers on a decision by the United States Department of Agriculture (the "Department") to disqualify the plaintiff's store from participation in the Food

---

Stamp Program for a period of five years. Plaintiff argues that this action was arbitrary and capricious because it was inconsistent with the applicable federal regulatory scheme. The district court, although it characterized the penalty as "harsh," nonetheless concluded that the Department's action was neither arbitrary nor capricious. We agree with the district court on both accounts, and we affirm.

## I.

David Carlson is the proprietor of a general service grocery store, Liberty Supermarket (the "Supermarket"), in Chicago Heights. There are no grocery chain stores in the vicinity of the Supermarket, although there are other stores carrying a full line of grocery items nearby (the closest one being approximately six blocks away). The Supermarket is in a predominantly low-income neighborhood which is also the site of a federally-funded housing project. Many area residents are food stamp recipients and the majority of the Supermarket's customers used food stamps for their purchases. Until April of 1988 Carlson's store accepted food stamps. However, because a Department investigation revealed that Supermarket employees were violating Food Stamp Program ("Program") rules, the Department disqualified Carlson's store from participation in the Program.

The Department first gave Carlson notice that there might be a problem in April of 1986, when a Program Food Specialist came to the Supermarket to meet with Carlson. At this meeting, Carlson was notified that his store had a high rate of food stamp redemption in comparison to other similar stores in the area. He was also told that this high redemption rate might indicate that stamps were being accepted in violation of Program rules. This visit was followed by an official written warning, dated April 26, 1986, from the Officer-in-Charge of the Food and Nutrition Service of the Department of Agriculture's Chica-

go Field Office. In October of 1986 the Department received an anonymous telephone call charging that Carlson's store was violating Program rules. In June of 1987 the Department began a series of investigative visits to the Supermarket. On five occasions the Department's investigator was able to purchase ineligible items with food stamps; on four of these occasions the ineligible items included ten or more packages of cigarettes.[1] Only on one occasion (June 10, 1987) was the investigator refused in her attempts to purchase ineligible items using food stamps. The district court specifically found the investigator's testimony regarding her visits credible.

Although testimony at trial was not wholly consistent, the trial court apparently accepted Carlson's testimony about his practice in instructing his clerks about accepting stamps for ineligible items. *Carlson v. United States,* No. 88 C 430, mem. op. at 6 ¶ 20 (N.D.Ill. Aug. 23, 1988). Carlson testified, "I told them that they could not take ineligible items and what are ineligible items. That would be soap, cigarettes, liquor, toilet articles—it was for edibles, it was for food." Trans. at 18. Carlson testified that he gave his employees this instruction as part of their training, and then on an ongoing basis "in a month, two or three times." *Id.* Although Carlson was not entirely clear as to the details, he also testified that he again reminded his employees about the Food Stamp Program rules "shortly after" the initial warning visit from the Program Food Specialist. *Id.* at 20. Carlson, who had served as meat cutter for the Supermarket even before he purchased the store from its previous owner, spent most of his time back in the meat department.

On October 14, 1987, the Officer-in-Charge of the Department's Chicago Field Office sent Carlson a letter officially charging his store with violations of the Program rules. The Department had during the

---

1. On June 3, 1987, the investigator purchased ineligible items using food stamps. On July 15, 1987, she again purchased ineligible items, this time including ten packages of cigarettes. On August 12, 1987, her purchase included ten packages of cigarettes. On August 21, 1987, she

purchased a number of ineligible items with food stamps, including fifteen packages of cigarettes. On September 2, 1987, the investigator included twelve packages of cigarettes in her purchase of ineligible items.

course of its investigation performed a study of six grocery stores in the area of Liberty Supermarket, and had concluded that comparable authorized grocery stores in the vicinity were sufficiently accessible that the disqualification would not result in any "undue hardship" to food stamp recipients. Carlson initially responded to the charges in person, at an October 23 meeting at the Program's Chicago Field Office. At that point Carlson could not confirm or deny the alleged violations. Carlson subsequently proffered a written response to the charges on November 5, 1987. After reviewing the case, the Field Office on November 10 notified Carlson that his store would be disqualified for a period of five years and that the Program would assess the Supermarket $101.77 for false claims. The Department's Administrative Review Division sustained the disqualification, but did not sustain the monetary assessment. On January 15, 1988, Carlson brought suit in the district court seeking review of the Department's decision to disqualify his store. After a trial de novo, Judge Alesia entered judgment in favor of the United States, concluding that the Department's action had not been arbitrary or capricious.

## II.

This court has distinguished between challenges to a finding of violation and challenges to the severity of the penalty:

> We have held that a penalty may be set aside only if arbitrary and capricious within the meaning of *Butz v. Glover Livestock Commission Co.,* 411 U.S. 182 [93 S.Ct. 1455, 36 L.Ed.2d 142] (1973).... The deference courts give to the penalty does not apply to the finding that a violation occurred. The district court must determine the validity of the agency's factual determinations anew, on a fresh record.

*McGlory v. United States,* 763 F.2d 309, 311 (7th Cir.1985) (citations omitted); *see also Nowicki v. United States,* 536 F.2d 1171 (7th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1103, 51 L.Ed.2d 537 (1977).

Carlson's challenge is to the severity of the penalty and is therefore to be reviewed under the "arbitrary and capricious" standard.

Under the enabling statute, any participating food store may be disqualified for a period of time "on a finding, made as specified in the regulations, that such store ... has violated any of the provisions of this chapter or the regulations issued pursuant to this chapter."[2] 7 U.S.C. § 2021(a). The statute also provides for an ascending range of disqualification time periods for repeat offenders:

> Disqualification under subsection (a) of this section shall be—
>
> (1) for a reasonable period of time, of no less than six months nor more than five years, upon the first occasion of disqualification;
>
> (2) for a reasonable period of time, of no less than twelve months nor more than ten years, upon the second occasion of disqualification; and
>
> (3) permanent upon the third occasion of disqualification or the first occasion of a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store or wholesale food concern....

7 U.S.C. § 2021(b). There is no question that Carlson's case falls under section 2021(b)(1), providing for disqualification of between six months and five years.

The regulations implementing these statutory provisions give further criteria for determining the length of a first-time disqualification. Where personnel of the firm have sold "common nonfood items due to carelessness or poor supervision by the firm's ownership or management," a six-month penalty is appropriate. 7 C.F.R. § 278.6(e)(5). Where a store has not received any prior warnings of possible violations and management personnel have sold "common nonfood items in amounts normally found in a shopping basket," the regulations prescribe a one-year disqualification. 7 C.F.R. § 278.6(e)(4). A three-

---

**2.** Alternatively, errant participants may be "subjected to a civil money penalty of up to $10,000 for each violation if the Secretary determined that its disqualification would cause hardship to food stamp households...." 7 U.S.C. § 2021(a).

year penalty is required where a store has received previous warnings and it is "the firm's p[r]actice to commit violations such as the sale of common nonfood items in amounts normally found in a shopping basket...." 7 C.F.R. § 278.6(e)(3)(i). Where a store has received previous warnings and it is "the firm's practice to sell expensive or conspicuous nonfood items, cartons of cigarettes, or alcoholic beverages in exchange for food coupons," a five-year disqualification is warranted. 7 C.F.R. § 278.6(e)(2)(i). A key difference between the five-year penalty and the lighter penalties is the kind of items sold; all of the other penalties involve the sale of "common nonfood" items, while the five-year penalty is triggered only when "expensive or conspicuous nonfood" items are involved.

The regulations do not further define these terms, but definitions are provided in the Handbook promulgated by the Food and Nutrition Service ("FNS"), the agency to which the Department has delegated authority to administer the Food Stamp Program. Participating businesses do not receive a copy of the FNS Handbook. According to the Handbook:

> (3) *Major ineligible items* are expensive or conspicuous nonfood items, and consist of the following:
>
> . . . . .
>
> (b) *Tobacco:* In a single transaction, one carton or ten loose packs of cigarettes ...
>
> . . . . .
>
> (d) *Expensive items:* Any ineligible item costing $10 or more.

FNS Handbook § 318 A.2.a.(3). The 1985 revisions to the Handbook specify that

> [v]iolations shall be attributed to a deliberate disregard of the regulations and as the firm's normal practice, as opposed to carelessness or poor supervision, when there has been a minimum of four sales of ineligible items, and any or all of the following persons took an active part in those violations:
>
> . . . . .
>
> 3. *Two or more clerks* who, based on investigative evidence, customarily engage in violative transactions in a case in which the record includes documentation that the owner ... had been advised of the possibility of violations occurring and the consequences of such violations. Refusal(s) by more than one clerk will usually negate a finding of a firm's practice to violate.

FNS Handbook (1985 Revision) § 318 B.

If we apply the Handbook provisions, there is little doubt that the five-year penalty is appropriate in Carlson's case. He had a prior warning from the Department. Ten or more packages of cigarettes were purchased using food stamps, on four separate occasions. Although the Department's investigator was refused once, by one clerk, that is not enough to negate a finding of firm practice under the Handbook guidelines. Thus, the Department's finding—that Carlson's store had a firm's practice of selling expensive or conspicuous nonfood items for food stamps—is clearly supportable under the definitions given in the Handbook.

However, Carlson urges that application of the Handbook definitions in this case violates the intent of the regulatory scheme, which in his view contemplates "escalating penalties primarily based upon the degree of involvement by firm ownership and management." Brief of Appellant at 12. Carlson, because he worked primarily in the meat department, was unlikely to have been involved in any violations that occurred—and there are no allegations that he was. Thus, argues Carlson, he should have been given the six-month penalty resulting from "carelessness or poor supervision," rather than the most severe available penalty. There is some merit in this argument; both the statute and the regulations provide for ascending penalties based on relative culpability. Although Carlson had received some notice that violations might be occurring in his store, his warning was based on Liberty Supermarket's relatively high food stamp redemption rate, which could simply have been the result of unusually heavy patronage by food stamp recipients. Carlson also took some action after the warning to remind his employees

that they should comply with the Program rules. And on one occasion an employee did refuse to accept stamps for noneligible items. In light of these mitigating circumstances, imposing the five-year penalty for a first-time disqualification seems an unhappy and unduly harsh solution.

Unfortunately, however, the result is not arbitrary and capricious, nor is it unreasonable in light of the existing regulatory scheme. That scheme contemplates increased penalties based not only upon the degree to which management is involved in violations, but also on the egregiousness of the violations involved. Further, even where management does not itself participate in the violations, management may be said to have been involved if it permits repeated violations to the degree that those violations can be characterized as "firm practice." Section 278.6(e)(2) does not speak of "intent" or "management involvement," but of "firm practice." *Accord Sims v. United States Dep't of Agric. Food and Nutrition Serv.*, 860 F.2d 858, 861 (8th Cir.1988) ("... the regulations do not require the FNS to explicitly find that the firm 'intended' to violate the law.... The ultimate finding which the regulations require ... is whether the firm had a 'practice' of selling nonfood items for stamps.").[3] The "firm practice" requirement replaces more explicit descriptions of degree of management involvement in the one-year and six-month provisions. The regulations define "firm practice" as "the usual manner in which personnel of a firm or store accept food coupons as shown by the actions of the personnel at the time of the investigation." 7 C.F.R. § 271.2.

In this case the Department repeatedly purchased major ineligible items at Carlson's store. One purpose of requiring that items be "conspicuous or expensive" is presumably to make it less likely that they were accepted accidentally or through oversight. It would be hard to conclude that it was arbitrary or capricious to denominate ten or more packages of cigarettes as "conspicuous"; in such a quantity, it is highly unlikely that a clerk could fail to notice these items. Although it is a somewhat closer question, the FNS's decision that repeated violations on four or more occasions suffice to indicate a "usual" manner of accepting coupons or a store "practice" cannot be said to be arbitrary or capricious.

Carlson cites the Ninth Circuit's opinion in *Plaid Pantry Stores, Inc. v. United States*, 799 F.2d 560 (9th Cir.1986). *Plaid Pantry* affirmed the district court's ruling that a three-year disqualification imposed by the Department was arbitrary and capricious. This conclusion rested in part upon the fact that the "[p]laintiff's employees are extensively trained in food stamp regulations and procedures.... The employees involved in the [violative] transactions were immediately terminated by plaintiff as a result of defendant's allegations." 799 F.2d at 564. Under the circumstances, the court felt that there were insufficient facts to indicate that it was plaintiff's "practice" to violate the Food Stamp Program rules.[4]

---

3. Several circuits have required proof of an owner's personal knowledge or participation before imposing permanent disqualification for "trafficking" in food coupons. *R Ranch Mkt. Corp. v. United States*, 861 F.2d 236 (9th Cir.1988); *Badwan v. United States*, 541 F.2d 1388 (10th Cir.1976). However, these cases carefully distinguished "trafficking" offenses, which do not by definition benefit the store (individual employees may be "trafficking" in coupons for personal benefit), from acceptance of ineligible items for food stamps: "Of course, the store receives a benefit from selling ineligible items and would register a profit on that volume." *R Ranch Mkt.*, 861 F.2d at 240 (quoting *Badwan*, 541 F.2d at 1390).

4. The court added somewhat cryptically that "[t]he FNS review officer did not consider plaintiff's intent as required by 7 C.F.R. § 278.6(d)." 799 F.2d at 565. Section 278.6(d) states that as a basis for disqualification determinations, the FNS regional office in question shall consider: (1) The nature and scope of the violations committed by personnel or the firm, (2) any prior action taken by FNS to warn the firm about the possibility that violations are occurring, and (3) any *other* evidence that shows the firm's intent to violate the regulations. 7 C.F.R. § 278.6(d) (emphasis added). This provision seems entirely consonant with the Handbook guidelines, which essentially delineate what sort of repeated violations by personnel suffice to implicate the firm as a whole. *Accord Banh v. United States*, 814 F.2d 1358 (9th Cir. 1987) (analyzing "firm practice" in terms of objective indicia such as number of ineligible items sold and number of visits by Department

Even giving Carlson the benefit of the doubt as to how often he instructed his employees, his efforts did not rise to the level described in *Plaid Pantry*. In any event, the Ninth Circuit subsequently determined that unpublished instructions substantially identical with those at issue here provided adequate guidance for determining whether violations were attributable to a store's policy. *Nguyen v. United States,* 824 F.2d 697 (9th Cir.1987).[5] Like the court in *Nguyen,* we take comfort in the fact that neither the Field Office nor the Administrative Review Division relied mechanically upon the provisions of the FNS Handbook, but rather used them as guidelines in making their own assessment that the violations were "flagrant and repetitive." Appendix of Appellant at D-3. We cannot say that application of those guidelines in this case was at odds with the intent of either the enabling statute or the governing regulations; nor can we conclude that the resulting .decision was arbitrary or capricious. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (agency's regulations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute;" where agency is implicitly delegated authority to elucidate provision of statute, a "court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."); *see also Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 403-04, 107 S.Ct. 750, 759-60, 93 L.Ed.2d 757 (1987); *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 844, 106 S.Ct. 3245, 3253, 92 L.Ed. 2d 675 (1986).

However, having held that the Department was legally entitled to impose this sanction, we again note the unfortunate nature of the result in this case. Although the warning given Carlson was technically adequate, *see Banh,* 814 F.2d at 1362, another more explicit warning, given after the Department became certain that violations were due to improper acceptance of food stamps (rather than overrepresentation of food stamp recipients in the neighborhood), might have averted this result. For the sanction imposed not only threatens to close down a small neighborhood store that has long served neighborhood residents but also disadvantages food stamp recipients who frequented the store. The goal of compliance measures is surely as much to bring participating stores into compliance, and educate their owners and employees, as it is to shut down non-complying stores. Somewhat less draconian penalties for initial violations might better effect that goal.

## III.

The judgment of the district court is AFFIRMED.

---

investigator); *Kulkin v. Bergland,* 626 F.2d 181 (1st Cir.1980) (same); *J.C.B. Super Mkts., Inc. v. United States,* 530 F.2d 1119 (2d Cir.1976) (same).

**5.** Carlson does not raise, and so we do not address, the issue whether reliance on the uncirculated guidelines violated the Freedom of Information Act. *But see Nguyen v. United States,* 824 F.2d 697 (9th Cir.1987).