**Thomas BROOKS, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Defendant.**

**UNITED STATES of America, Counterplaintiff,**

v.

**Thomas BROOKS, Counterdefendant.**

No. 93 C 4491.

United States District Court, N.D. Illinois, E.D.

Jan. 14, 1994.

Thomas Brooks, pro se.

Brian Havey, Chicago, IL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

Thomas Brooks ("Brooks") has filed a self-prepared Complaint against the United States Department of Agriculture ("Department"), in which he challenges the decision of the Secretary of Agriculture ("Secretary") to disqualify his sole proprietorship Sir Bee's Food Mart ("Sir Bee's"), 337 East 69th Street, Chicago, Illinois from participating in the government's Food Stamp Program (the "Program," established by 7 U.S.C. §§ 2011–2032 [1]) for a three-year period. In response

---

1. Further citations to the Program's statutory provisions will take the form "Section—," refer- ring to the Title VII numbering rather than to the

the United States has acknowledged this Court's jurisdiction over the review of Secretary's administrative decision under Section 2023(a) (although the United States has properly pointed out that it and not Department is the correct defendant here). In addition, the United States has coupled its Answer to Brooks' Complaint with a two-count Counterclaim seeking recovery alternatively under the False Claims Act (31 U.S.C. § 3729(a)(1)[2]) or for unjust enrichment.

This Court conducted a bench trial over a period of several days, during which Brooks elected to represent himself. Trial continuances were granted to enable Brooks to reach whatever witnesses and to obtain whatever exhibits he said he needed to present his case. After the proofs were closed, another brief continuance was granted to enable both Brooks and government counsel to assemble their thoughts for the preparation of closing arguments. Then at the conclusion of the closing arguments this Court stated its decision orally, summarizing certain findings of fact ("Findings") and conclusions of law ("Conclusions").

These Findings and Conclusions are intended to formalize this Court's decision and to provide full details explaining the basis of the judgment reached by this Court.[3] To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both of those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

*Findings of Fact*

1. Anyone who owns a retail food store and wishes to participate in the Program is first required to participate in an orientation session (given weekly) at the Chicago office of Department's Food and Nutrition Service ("Service"), a session that is then followed immediately by an individual interview. Decisions by the Service authorizing such participation are based on the information in the application that must then be filled out by the applicant and, if the Service deems it necessary (as is not too often the case), based on a visit to the store as well. After such authorization is granted, the Service's Minneapolis computer center issues certificates for redemption and mails them directly to the store. Food stamps may be exchanged only for "eligible foods," defined in relevant part by 7 C.F.R. § 271.2 as "any food or food product intended for human consumption except ... hot foods and hot food products prepared for immediate consumption." In short, it is improper not only to accept food stamps in exchange for commodities other than food but also to accept such stamps in exchange for the kinds of products purveyed in establishments commonly known as "fast food" operations.

2. After an authorized store that is participating in the Program accepts food stamps in exchange for its sale of eligible foods, it takes those stamps to a financial institution together with a redemption certificate in which the participant certifies the total amount and also certifies that the food stamps were indeed used to purchase eligible foods. That financial institution redeems the certificate, so that the store participating in the program is paid the full value of the food stamps, and the financial institution is then in

internal numbering of the Food Stamp Act of 1977 as amended that established the Program.

**2.** Citations to the False Claims Act will also take the form "Section—," referring to the Title 31 numbering. Despite the dual usage of "Section—," there is no potential for confusing False Claims Act citations with references to the Program, given the substantial difference in the numbering within the two Titles.

**3.** Apart from the far more detailed exposition of this Court's decision set out here, there are some

minor respects in which these Findings and Conclusions differ from this Court's oral summary at the conclusion of the closing arguments. Perhaps most notably, this Court had not then calculated the precise amount of the United States' damages award, so that the oral pronouncement stated an estimated amount close to (but not exactly the same as) the final figure reflected here. In all events, these Findings and Conclusions supersede this Court's oral statement in its entirety.

turn reimbursed by the Federal Reserve Bank. Certificates of redemption are retained by the Federal Reserve Bank for only a six-month period before they are destroyed. However, the Service's Minneapolis computer center does maintain a permanent microfilm record of the redemption certificates (no copies are retained in the Chicago office, but it has access to the Minneapolis computer in that respect).

3. Brooks originally applied for Sir Bee's participation in the Program on August 7, 1991, and approval was granted by authorizing official Loretta Mitchell ("Mitchell," the officer in charge of Service's Chicago office) on August 16. In Brooks' application (Govt. Ex. 2) he checked the description "Medium or Small Grocery" rather than any of the other 15 or so listed categories (one of which was a combination "Grocery/Restaurant"), but he also checked "Household Supplies," "Hot Food" and "Hardware" as non-food inventory items that he would handle in the seven-day-a-week 8 a.m. to 10 p.m. operation that he portrayed. In the portion of the form that called for a statement of the store's volume, he estimated annual gross sales of $82,000, $55,000 of which were estimated as food sales.

4. When the Service then mailed out the redemption kit to Sir Bee's to enable Brooks to begin participating in the Program, the kit was returned with a notation "store closed." It developed during the trial that Brooks was then still remodeling the store, so that it had not yet opened for business. After the Service made several unsuccessful attempts to reach Brooks, the original authorization was cancelled. Some time later Brooks called to inquire what had happened to his authorization and was told about the just-described events, so he reapplied for Program participation on February 18, 1992 (Govt. Ex. 3). This time Brooks estimated the store's annual sales at $85,000, of which $75,000 was estimated as the volume of food-stamp-eligible sales of food. Again Brooks checked the "Medium or Small Grocery" type of operation rather than any other choice, but this time the only non-food inventory that he listed was for "Household Supplies"—nothing

was checked to cover "Hot Food" or other items.

5. During the course of the authorization process when Brooks filed his second application for participation in February 1992, Senior Food Program Specialist Bohumil Polcar ("Polcar") met with Brooks at Service's Chicago office. At that time Polcar both obtained information from Brooks and gave some information about the Program to Brooks. In part Polcar inquired about the size of the Sir Bee's store and the products carried there. In response to the question about what types of foods Brooks would be selling, he responded essentially:

All staple foods except for fresh meat and produce.

Polcar then reinstructed Brooks in the restrictions imposed by the Program, including the fact that no credit could be given to customers, that food stamps were not to be accepted for cash (even on a dollar for dollar basis) and also as to what foods would qualify. Brooks gave no indication of any lack of understanding in any of the respects covered by that meeting.

6. After obtaining his second authorization to participate in the Program, Brooks proceeded to submit the necessary documentation (food stamps and redemption certificates) on a regular basis. After those submissions had covered something more than three full months of Sir Bee's operations, the Service's Minneapolis computer generated a printout that automatically included the store on a list of Program participants as to which questions appeared to exist based on a comparison between their projected food sales and their actual redemptions. As to Sir Bee's, its food stamp redemptions were not only grossly over the average for stores in the same census tract (most of which were small neighborhood stores whose sales would normally be expected to be comparable to each other) but had also totaled—even though only a fraction of a year had elapsed—over 90% of the amount that Brooks had listed as Sir Bee's anticipated *annual* sales. To determine whether some computer error may have been the source of that reported disparity, Mitchell ordered copies of Sir Bee's actual redemption slips

from the Minneapolis office. Those slips confirmed the existence of a potential problem: In just the first three full months of its operations (April through June 1992), Sir Bee's food stamp redemptions aggregated nearly ⅔ of Brooks' entire $75,000 annual estimate.

7. Mitchell then took two steps in an effort to ascertain what the situation was in terms of Brooks' compliance with the Program's requirements. For one thing, on February 22, 1993 she sent Brooks the type of "affirmation letter" (Govt. Ex. 8) that is typically sent to food stamp participants where any such question exists, in which she told him that in terms of his original estimate as to volume, the amount of food stamp redemptions exceeded the eligible food sales as he had stated them. Accordingly the letter asked that Brooks provide further information if the original sales information were not correct or if he wanted to provide any additional information (for which purpose it would be necessary for him to provide supporting documentation, such as sales tax returns or purchase invoices). In addition to sending that "affirmation letter," Mitchell also directed Polcar to go out to observe Sir Bee's operation.

8. When Polcar went out on February 25, 1993 to observe Sir Bee's at Mitchell's direction, he did so through a drive-by (a brief few minutes' observation from his automobile) rather than by entering the store. Even on the basis of that limited observation it was apparent to Polcar, in consequence of his extensive experience with Program participants over a period of many years, that the operation that he observed at Sir Bee's could not legitimately account for the large volume of food stamps that had been submitted by Brooks for redemption. On that same day Polcar placed a brief written report in the file covering his drive-by visit (Govt. Ex. 13).

9. Sometime after receiving Mitchell's "affirmation letter" (Govt. Ex. 8), Brooks telephoned her to inquire why the type of documentation referred to was needed (nothing in the record reflects just when that inquiry was made, but nothing turns on that). When Mitchell explained the need for verification in light of the Program's purposes, Brooks told her that he kept no receipts or invoices at all to evidence his purchases.

10. As a result of Brooks' lack of any satisfactory response to the "affirmation letter," on March 18, 1993 Mitchell then properly transmitted a "charge letter" (Govt. Ex. 9) to Brooks, notifying him "that there is reason to believe that you, doing business as Sir Bee's Food Mart, 337 East 69th Street, Chicago, have violated the terms and conditions of the regulations governing the Food Stamp Program (hereinafter called the Regulations) as stated in the following paragraph." What followed in the "charge letter" was a statement of the disparity between the amount redeemed in food coupons from February 1, 1992 through January 31, 1993 and Brooks' statement at the time that he had obtained his second authorization—contrasting Brooks' $75,000 estimate of gross food sales in that second application for participation with the actual food stamp redemptions aggregating $232,256. After a detailed month-by-month listing of those redemptions, Govt. Ex. 9 went on:

Because of the seriousness of these charges, your store is being considered for disqualification from the Food Stamp Program or the imposition of a civil money penalty in lieu of disqualification. Therefore, we encourage you to give us the benefit of any information, explanation or evidence you have regarding these charges. *To insure consideration of your response, you should reply within ten days of the date you receive this letter.* You may respond either in writing or in person. If you wish to reply in writing, please send your reply to Loretta Mitchell, Officer-in-Charge, U.S. Department of Agriculture, Food and Nutrition Service, Chicago Field Office, 55 East Monroe, Room 1530, Chicago, Illinois, 60603. If you wish to reply in person, please telephone Ms. Mitchell at (312) 353-4413 for an appointment.

We will fully consider your reply and any information you provide before we make a decision in this matter. Any revision in sales figures presented to the Field Office must be substantiated by documentation

such as sales receipts or other records which support the new figures. Any documentation presented shall be segregated in an orderly, chronological fashion and summarized in order to be considered in your reply. However, if we do not hear from you within the time indicated we will make a decision based on the information already available to us.

11. In response to the "charge letter" Brooks telephoned to tell Mitchell that he could not provide any kind of records at all to support his compliance with the Program. Mitchell then gave him additional time for that purpose, explaining that he might perhaps make the necessary showing by obtaining supporting information from his food suppliers. When Brooks still failed to furnish any verification whatever, on April 21, 1993 Mitchell sent a "determination letter" (Govt. Ex. 11) that (a) found Brooks in violation of the Program's regulations as specified in the "charge letter," (b) disqualified Sir Bee's from participation in the Program for a three-year period and (c) asserted a claim for repayment of $157,256 (the $232,256 that Brooks had redeemed in food stamps less his $75,000 annual estimate at the time of application).

12. Brooks timely exercised his right of administrative review (during which period Sir Bee's continued to stay in operation and to participate in the Program). On June 22, 1993 Department's Administrative Review Officer Grady Smithey, Jr. notified Brooks in writing of his decision that the administrative charge was valid and that the three-year nonparticipation sanction was sustained (Govt. Ex. 12). Smithey concluded his written decision by advising Brooks of his right to judicial review, and Brooks timely filed his Complaint seeking such review before this Court.

13. Polcar's description of Sir Bee's operation, which as already stated was the result of a single brief drive-by observation, will not be credited by this Court as to the particulars of the Sir Bee's store in terms of its layout and the facilities that it provides. But other credible trial testimony confirms that Brooks has not even come close to sustaining his burden of demonstrating compliance with the Program (while that testimony also confirms Polcar's ultimate conclusion, reached via his brief observation in that respect):

(a) Brooks had originally stated that his outside bookkeeping service would provide the necessary verification of his food-stamp-eligible redemptions in the de novo proceeding conducted by this Court. But in fact the testimony of independent bookkeeper Duke Bingham ("Bingham") established exactly the opposite. Bingham testified that Brooks had simply given him numbers to fill in on the reports that he had to prepare, without Brooks having provided any verification or supporting records whatever. As a result of what Bingham concluded was fraudulent activity on Brooks' part, Bingham terminated the relationship between them. Bingham's actual observation of Sir Bee's operation—which was the result of a few visits to the premises—disclosed it to be what Bingham called a "very nice clean fast food business" (something that, as already stated, would *not* qualify for food stamp redemptions), with the store containing a limited amount of inventory and shelving that would be totally inadequate to support the extremely high volume of food stamp redemptions claimed by Brooks. Bingham's testimony reflected that he was very familiar with the distinction between eligible foods and things that were ineligible for food stamp redemption (in substantial part that familiarity was required because of his need to deal with the very large differential between the sales tax treatment of food-stamp-eligible sales and the treatment of other sales—part of Bingham's bookkeeping service for small businesses involves the preparation of sales tax returns). Bingham described his observation of Sir Bee's as what he called a "rib joint" providing "fast food," rather than as a grocery.

(b) Brooks also called his lessor Willie Benjamin ("Benjamin") as a witness in an effort to discredit Polcar's testimony in which the latter had described his observation of Sir Bee's. But Benjamin too began his testimony by voluntarily describing Sir Bee's as a "fast food store," thus providing

some added confirmation of the store's lack of capability to justify the volume of food stamp redemptions that had been claimed by Brooks.

Brooks' own testimony in support of his claim was not credible, and he provided no justification for the total lack of documentary support that he had provided—including the total lack of either documentary or testimonial support from his suppliers.

14. This Court has no way of determining how Brooks actually obtained the food stamps that he submitted for redemption and that were not in fact acquired by him in exchange for the purchase of food that qualified for the Program. There is no doubt, however, that Brooks' certifications accompanying his submission of redemption certificates were false. There is also no doubt that such false claims resulted in substantial damages to the United States (see Finding 16).

15. Although Brooks has also clearly violated the Food Stamp Act by his excessive volume of stamp redemptions (including, for example, months in which such redemptions reached the incredible levels of $58,000 and then $104,000, totally impossible given the nature of Brooks' operation[4]), the level of excessive redemptions was not as great as the United States claims. Brooks' original estimate of $75,000 of annual food stamp redemptions was only that: an estimate prepared before Sir Bee's actually began to operate. Based on all of the testimony as to the facilities of the Sir Bee's store and the nature of Brooks' operations in the store, the amount of redemptions reasonably obtainable by the store was at the rate actually redeemed in the first three months of operations ($15,641 in each of May and June 1992 and $16,845 in July 1992, Govt. Ex. 9)—an average of $16,042.33 per month.

16. As already stated, Brooks' food stamp redemptions during a 10–month period aggregated $232,256. As reflected in Finding 15, the reasonable redemptions during

that same period would have aggregated $160,423. Accordingly the excess redemptions—Brooks' violation of the law (both the Food Stamp Act and the False Claims Act—amounted to $71,833.

*Conclusions of Law*

1. This Court has jurisdiction of this action under (a) Section 2023(a) (providing for judicial review of the administrative determination disqualifying Sir Bee's participation in the Program), (b) Section 3732(a) (as to the United States' counterclaim charging Brooks' violation of Section 3729(a)(1)—see Section 3730(a)) and (c) 28 U.S.C. § 1345 (as to the United States' alternative claim for unjust enrichment).

2. As for this Court's judicial review under Section 2023(a), the Court's determination as to whether or not Brooks violated the Program is de novo. As *McGlory v. United States,* 763 F.2d 309, 310–11 (7th Cir.1985) (per curiam) (citations omitted) put it:

> The trial is "de novo"—that is to say, on a new evidentiary record. Because the statute does not provide for any evidentiary hearing at the administrative level, it gives each participant a right to trial "de novo." This trial is the one and only hearing a participant in the program receives.

In that respect, however, Brooks has the burden of showing that the alleged violations of the Food Stamp Act and its regulations did not occur (*Redmond v. United States,* 507 F.2d 1007, 1011–12 (5th Cir.1975)), so that the administrative decision must be upheld unless Brooks can show by a preponderance of the evidence that the decision is invalid (*Abdel v. United States,* 670 F.2d 73, 76 n. 8 (7th Cir.1982)).

3. Because this Court has found that Brooks indeed committed the charged violations, the issue remaining on his Complaint for administrative review is whether Sir

---

**4.** Those levels were reached in December 1992 and January 1993, the last two months that were referred to in the Service's charge letter of March 18, 1993 (Govt. Ex. 9). But in fact Govt. Ex. 1 shows that Brooks' volume of redemption through Sir Bee's continued at an excessive level, inconsistent with the nature of the store's operation, during the period after actual termination while Sir Bee's continued in the Program during the processing of the administrative appeal: redemptions for February 1993 amounted to $44,-500, for March 1993 amounted to $36,000, for April 1993 amounted to $24,000 and for May 1993 came to $21,347.

Bee's three-year suspension was an appropriate penalty to impose. In that respect the administrative decision is entitled to substantial deference—again to quote from *McGlory*, 763 F.2d at 311) (citations omitted), which has since been quoted in part and approved in its entirety in *Carlson v. United States*, 879 F.2d 261, 263 (7th Cir.1989):

> This court has distinguished between challenges to the finding of violation and challenges to the penalty, given a violation. We have held that a penalty may be set aside only if arbitrary and capricious within the meaning of *Butz v. Glover Livestock Commission Co.*, 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973).

■ 4. Brooks in fact violated the Program by the large amount of excess food stamp redemptions that he obtained through Sir Bee's. Accordingly the termination of his (that is, Sir Bee's) participation in the Program was valid, and both that termination and his suspension from further participation in the Program for a three-year period must be and are affirmed.

■ 5. As to the United States' counterclaim charging Brooks with violation of the False Claims Act, it has the burden of proving the elements of that claim (including Brooks' intent to cheat the government) by a preponderance of the evidence (*United States v. Thomas*, 709 F.2d 968, 971–72 (5th Cir.1983); cf. *United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir.1992)). It has readily sustained that burden. Brooks' excessive redemptions were indeed the result of his filing of false claims in violation of Section 3729(a)(1). Those false claims caused $71,833 in damages to the United States.

6. Under Section 3729(a) the United States is entitled to recover as a civil penalty three times the amount of the damages it has sustained, or the sum of $215,500. In conjunction with that recovery the United States has waived its right to recover a further civil penalty in the fixed amount of not less than $5,000 and not more than $10,000 under Section 3729(a) (see United States Trial Br. 7 n. 6).

■ 7. Because the United States' alternative claim of unjust enrichment would constitute a duplicative recovery in light of its already-adjudicated recovery under the False Claims Act, that unjust enrichment counterclaim is dismissed.

\* \* \*

Judgment is ordered to be entered (1) affirming Secretary's determination that disqualified Sir Bee's participation in the Food Stamp Program for a period of three years, and accordingly (2) dismissing Brooks' Complaint seeking reversal of that determination. Judgment is also ordered to be entered in favor of the United States and against Thomas Brooks in the sum of $215,500 under the False Claims Act (United States Counterclaim Count I), while United States' Counterclaim Count II is ordered dismissed.