# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 13, 2016          Decided December 30, 2016

No. 16-7029

DONNA MARIE COBURN, ON BEHALF OF HERSELF AND ALL
OTHERS SIMILARLY SITUATED,
APPELLANT

v.

EVERCORE TRUST COMPANY, N.A.,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00049)

———

*Peter W. Overs*, *Jr.* argued the cause for the appellant.
*Robert I. Harwood* was with him on brief.  *Daniel M. Cohen*
entered an appearance.

*Jonathan D. Hacker* argued the cause for the appellee.
*Meaghan VerGow* was with him on brief. *Jeffrey W. Kilduff*
entered an appearance.

Before: HENDERSON and ROGERS, *Circuit Judges*, and
EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Opinion concurring in the judgment filed by *Circuit Judge* ROGERS.

Concurring opinion filed by *Senior Circuit Judge* EDWARDS.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Donna M. Coburn, on behalf of herself and all others similarly situated, appeals the district court's dismissal of her complaint against Evercore Trust Company, N.A. (Evercore) pursuant to the Employee Retirement Income Security Act of 1974 (ERISA) §§ 409, 502(a)(2)-(3), 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3). Coburn, a former J.C. Penney employee and investor in a J.C. Penney employee stock ownership plan (ESOP) managed by Evercore, claims that Evercore breached its fiduciary duties of prudence and loyalty when it failed to take preventative action as the value of J.C. Penney common stock tumbled between 2012 and 2013, thereby causing significant losses. Despite clear factual similarities, Coburn argues that the pleading requirements outlined in *Fifth Third Bancorp v. Dudenhoeffer*, __ U.S. __, 134 S. Ct. 2459 (2014), are inapplicable to her allegations because she challenges Evercore's failure to appreciate the riskiness of J.C. Penney stock rather than Evercore's valuation of its price. We disagree and therefore affirm the district court's judgment.

## I. Background

While Coburn was employed by J.C. Penney, the large retailer offered its employees the opportunity to "save for their retirement" by investing in the J.C. Penney Savings Profit-Sharing and Stock Ownership Plan (the Plan). Its defined contribution plan was an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and an eligible individual account plan within

the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3). Once an employee opted into the Plan, she could allocate her contribution among a variety of investment options. One of the options was the Penney Stock Fund, an ESOP that consisted largely of J.C. Penney common stock. This was the option Coburn selected.

On December 17, 2009, Evercore became the designated fiduciary and investment manager of the Penney Stock Fund. In this role, Evercore had the authority to restrict or limit the ability of Plan participants to purchase or hold J.C. Penney stock, including the power to "eliminate the [Penney Stock Fund] as an investment option under the Plan and to sell or otherwise dispose of all of the Company Stock held in the [Penney Stock Fund]." Evercore did not manage any other investment option available through the Plan.

In 2011, J.C. Penney attempted to reconceptualize its brand and hired former Apple, Inc. executive Ron Johnson as its chief executive officer. Distancing himself from J.C. Penney's historic reliance on sales, coupons and rebates to boost sales, Johnson implemented a more straightforward pricing scheme, reasoning that a "fair and square" pricing policy would attract shoppers. Johnson also reworked both the Company logo and the traditional layout of its stores in an effort to modernize. Taken as a whole, Johnson sought to bring J.C. Penney up to speed with the fads and fashions of 2012, simplifying the business model in order to lower expenses and increase gross profit margins. This strategy proved to be less than successful.

J.C. Penney's 2012 first quarter earnings report showed a $163 million loss, or a $0.75 loss per share. Johnson's poor start was only the beginning, as the next twenty-one months—from the end of 2012's first quarter to the end of

2013's fourth quarter—saw J.C. Penney's stock price fall from $36.72 to $5.92 per share. As market analysts became increasingly bearish regarding its stock, J.C. Penney cancelled dividends for only the second time since 2006. The disastrous performance led Johnson to a telling realization: the abandoned coupons "were a drug" that "really drove traffic." Johnson's tenure ended in April 2013.

Throughout the entire period that the value of J.C. Penney common stock dipped ever lower, Evercore stood resolute. Despite its authority to eliminate the Penney Stock Fund as an investment option in the Plan and its ability to sell shares currently in the Fund, Evercore exercised neither option. The shares in the Penney Stock Fund that Coburn and other investors owned took the full force of the hit. In 2015, Coburn sued on behalf of herself and all others similarly situated, alleging that Evercore was liable for $300 million in losses to the Plan for having breached its fiduciary duty under ERISA §§ 409, 502(a)(2)-(3), 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

On February 17, 2016, the district court granted Evercore's motion to dismiss the complaint for failure to state a claim. Primarily relying on the United States Supreme Court's opinion in *Dudenhoeffer*, the district court held that Coburn's allegations that Evercore should have recognized from publicly available information alone that continued investment in J.C. Penney common stock was "imprudent" were generally implausible absent "special circumstances" affecting the market. Because Coburn failed to plead special circumstances—indeed, Coburn expressly disclaimed any need to plead them—the district court held that Coburn's complaint could not survive Evercore's Rule 12(b)(6) challenge. The district court also rejected Coburn's alternative argument that, pursuant to *Tibble v. Edison International*, __ U.S. __, 135 S. Ct. 1823 (2015), Evercore violated its fiduciary

"duty to monitor" investments and remove imprudent ones. The court reasoned that *Tibble* did not affect the *Dudenhoeffer* holding and thus could not save Coburn's complaint. Coburn timely filed her notice of appeal.

## II. Analysis

We review de novo the dismissal of a complaint for failure to state a claim. *Taylor v. Reilly*, 685 F.3d 1110, 1113 (D.C. Cir. 2012). The familiar pair of *Iqbal* and *Twombly* guide the analysis of a Rule 12(b)(6) motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Under that precedent, a complaint must "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 570). That is, the complaint must include factual allegations that, when taken as true, rise above a "speculative level." *Twombly*, 550 U.S. at 555. It is "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief [with] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (first alteration in original) (internal quotation marks omitted).

In *Dudenhoeffer*, the Supreme Court further refined pleading requirements regarding "allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock." *See Dudenhoeffer*, 134 S. Ct. at 2471; *accord In re Lehman Bros. Sec. & ERISA Litig.*, 113 F. Supp. 3d 745, 755 (S.D.N.Y. 2015) (noting that *Dudenhoeffer* "appears to have raised the bar for plaintiffs seeking to bring a claim based on a breach of the duty of prudence" (internal quotation marks omitted) (emphasis removed)), *aff'd sub nom. Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 66 (2d Cir. 2016). In *Dudenhoeffer*, a putative class of employees brought a claim

against fiduciaries who oversaw an ESOP, alleging that they had violated the duties of loyalty and prudence imposed by ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109, 1132(a)(2). *Dudenhoeffer*, 134 S. Ct. at 2464. Specifically, the *Dudenhoeffer* plaintiffs alleged that the fiduciaries "knew or should have known that [the employer company's] stock was overvalued and excessively risky," in part because "publicly available information such as newspaper articles provided early warning signs" of the company's financial troubles. *See id.* The *Dudenhoeffer* fiduciaries, however, "continued to hold and buy" the company's stocks, a move that ultimately "eliminated a large part of the retirement savings that the participants had invested in the ESOP." *Id.*

The Supreme Court affirmed the district court's dismissal of the complaint, holding that "where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of special circumstances." *Id.* at 2471. Driving the *Dudenhoeffer* opinion was the recognition that "investors . . . have little hope of outperforming the market in the long run based solely on their analysis of publicly available information, and accordingly they rely on the security's market price as an unbiased assessment of the security's value in light of all public information." *Id.* at 2471 (internal quotation marks omitted) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, __ U.S. __, 134 S. Ct. 2398, 2411 (2014)). *Dudenhoeffer* was thus grounded in the efficient capital market theory—the "theory that security prices reflect all available information." Yesha Yadav, *How Algorithmic Trading Undermines Efficiency in Capital Markets*, 68 VAND. L. REV. 1607, 1632 (2015) (citing Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383, 384 (1970)); Appellee's Br. 11-12. Indeed, according to the

efficient capital market theory, a security price in an efficient market "represents the market's most accurate estimate of the value of a particular security based on its riskiness and the future net income flows that investors holding that security are likely to receive." Yadav, *supra* at 1633; *accord Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) ("[T]he market price of shares traded on well-developed markets reflects all publicly available information . . . ."). "Where efficient markets exist, traders cannot profit by using existing information available in the market, since this news should already be reflected in securities prices." Yadav, *supra* at 1633. Instead, a security's price fluctuates only on the "arrival of *new* information into the exchange." *Id.* (emphasis added). Echoing this theory, *Dudenhoeffer* agreed that "[a] fiduciary's 'fail[ure] to outsmart a presumptively efficient market . . . is . . . not a sound basis for imposing liability.'" *Id.* at 2472 (quoting *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 992 (7th Cir. 2013)).

Thus, because a stock price on an efficient market reflects all publicly available information, *Dudenhoeffer* requires additional allegations of "special circumstances" when a plaintiff brings a breach of the duty of prudence claim against a fiduciary based on that information. Special circumstances, the Court instructed, includes evidence questioning "the reliability of the market price as an unbiased assessment of the security's value in light of all public information . . . that would make reliance on the market's valuation imprudent." *Id.* (quoting *Halliburton Co.*, 134 S. Ct. at 2411) (internal quotation marks omitted). This evidence may demonstrate that illicit forces (such as fraud, improper accounting, illegal conduct, etc.) were influencing the market, *Smith v. Delta Air Lines Inc.*, 619 F. App'x 874, 876 (11th Cir. 2015) (per curiam), or may otherwise suggest that the market was *not* efficient and therefore the market price of a security in that market was *not*

necessarily indicative of its underlying, fundamental value.[1] *See id*. Ultimately, "[*Dudenhoeffer*] suggested that the special circumstances might include something like available public information tending to suggest that the public market price did not reflect the true value of the shares." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 679 (7th Cir. 2016).

Applying *Dudenhoeffer* here, we believe Coburn's claim falls far short. Despite the Supreme Court's instruction that claims of imprudence based on publicly available information must be accompanied by allegations of "special circumstances," Coburn acknowledges that she "did not allege the market on which J.C. Penney stock traded was inefficient . . . ." Appellant's Br. 21. Quite clearly, then, if *Dudenhoeffer* controls, Coburn's complaint was properly dismissed.[2] *Dudenhoeffer*, 134 S. Ct. at 2471.

---

[1] "An inefficient market, by definition, does not incorporate into its price all the available information about the value of a security." *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 198 (6th Cir. 1990). In an inefficient market, it is plausible that a fiduciary could act imprudently by not acting on publicly available information because there is less assurance that that information has already been incorporated into the security price. *Cf. Dudenhoeffer*, 134 S. Ct. at 2471. "[M]arket efficiency is a matter of degree and accordingly . . . a matter of proof." *Halliburton Co.*, 134 S. Ct. at 2410. The degree to which a market must be inefficient to meet the "special circumstances" bar need not be decided here—we leave that question for another day.

[2] In district court, Coburn also argued that Evercore violated a continuing duty to monitor investments as set forth in *Tibble*, 135 S. Ct. at 1828. Whereas *Dudenhoeffer* primarily focuses on allegations of misvaluation in the marketplace, *see* 134 S. Ct. at 2471, *Tibble* focuses on the prudence of holding particular investments over time, requiring a fiduciary "to conduct a regular review of its investment

9

Perhaps recognizing the inadequacy of her claim under *Dudenhoeffer*, Coburn instead attempts to distinguish *Dudenhoeffer*, arguing that the additional pleading requirements set forth therein are inapplicable to her allegations. Appellant's Br. 11-12, 19-20. Coburn insists that her claim is *not* that Evercore over- or undervalued J.C. Penney stock but instead that Evercore exposed her to "outsized and unnecessary retirement savings risk" by failing to act as J.C. Penney stock value dipped ever lower. *Id.* at 11. This risk exposure, according to Coburn, was especially egregious given that the purpose of the Penney Stock Fund was to help employees like Coburn prepare for retirement—Evercore should have recognized its investors' low risk tolerance. *Id.* at 19-20. In a nutshell, then, Coburn argues that Evercore was imprudent for continuing to hold J.C. Penney common stock when it became increasingly and excessively risky—a claim that should fall under *Iqbal*/*Twombly* instead of *Dudenhoeffer*.

---

with the nature and timing of the review contingent on the circumstances." 135 S. Ct. at 1827-28. It is conceivable, then, that publicly available information that is insufficient to allege a plausible claim against a fiduciary under *Dudenhoeffer* would nonetheless be sufficient to survive a motion to dismiss under *Tibble* if the fiduciary failed to "conduct a regular review" of its investment in light of that publicly available information. *See id.* And indeed, Coburn's allegations—that Evercore "failed to engage in proper monitoring of the [Penney] Stock Fund," Joint Appendix 20—would perhaps be sufficient to survive a motion to dismiss under *Tibble*. Coburn failed, however, to make this argument on appeal—indeed, Coburn does not cite *Tibble* once in her brief—and the argument is therefore forfeited. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (issues not raised in opening brief are forfeited on appeal).

We disagree.[3] For one, the plaintiffs in *Dudenhoeffer* itself made the same argument, specifically claiming that the fiduciaries there should have known that the company stock was *both* "overvalued and *excessively risky*." *Dudenhoeffer*, 134 S. Ct. at 2464 (emphasis added). Without preamble, the Supreme Court disposed of the risk-based claims through its broad rule that "allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule." *Id.* at 2471. If the Supreme Court had no difficulty in using its value-centric rule to dismiss a risk-based claim by plaintiffs with similar risk tolerance, we have no license to deviate therefrom here. *See id.*; *Rinehart*, 817 F.3d at 66 ("Although the language of [*Dudenhoeffer*] refers primarily

---

[3] The factual premise on which Coburn's argument rests is itself faulty. Although we have previously recognized as a central pillar of financial analysis that "past trend[s] can often be accepted as a dependable index of the future," *Am. Airlines, Inc. v. Civil Aeronautics Bd.*, 192 F.2d 417, 421 (D.C. Cir. 1951), this acknowledgement is a far cry from the proposition that past market trends *will always* continue into the future. If the latter proposition were true, any investor with an elementary understanding of a put option would be exceedingly wealthy after having shorted J.C. Penney stock in 2012, the beginning of the class period. Instead, at any given point, a security's risk of loss is counterbalanced by the possibility of gain and a stock price reflects, *inter alia*, the market's equilibrium point between those competing forces. *See Cent. Nat'l Bank of Mattoon v. U.S. Dep't of Treasury*, 912 F.2d 897, 901 (7th Cir. 1990) ("The prices of the stocks of weak companies are bid down in the market until those stocks yield the same risk-adjusted expected return as the stocks of the strongest companies; otherwise no one would hold stock in a weak company—the prices of such stock would fall to zero."). To the extent Coburn argues that Evercore knew that J.C. Penney stock was certain to suffer future losses because of past poor performance, *see* Appellant's Br. 8 ("Evercore Saw It Coming"), we reject that claim as implausible.

to 'over- or undervaluing' stock, the . . . Court applied [the heightened pleading] rule to the plaintiffs' risk-based claims in that case.").

Additionally, well-reasoned decisions by our sister circuits have also determined that risk-based claims must nonetheless meet *Dudenhoeffer*'s pleading requirement to survive a motion to dismiss. For example, in no uncertain terms, the Second Circuit held that "the purported distinction between claims involving 'excessive risk' and claims involving 'market value' is illusory." *Rinehart*, 817 F.3d at 66. The *Rinehart* court agreed that *Dudenhoeffer* "foreclose[d] breach of prudence claims based on public information irrespective of whether such claims are characterized as based on alleged overvaluation or alleged riskiness of a stock." *Id.* (emphases and internal quotation marks omitted) (quoting *In re Lehman Bros. Sec. & ERISA Litig.*, 113 F. Supp. 3d at 756). The Sixth Circuit also followed this approach in *Pfeil v. State Street Bank and Trust Co.*, where it reiterated that the "excessively risky character of investing ESOP funds in stock of a company experiencing serious threats to its business . . . is accounted for in the market price, and the Supreme Court held that fiduciaries may rely on the market price, absent any special circumstances affecting the reliability of the market price." 806 F.3d 377, 386 (6th Cir. 2015) (internal quotation marks omitted) (quoting *In re Citigroup ERISA Litig.*, 104 F. Supp. 3d 599, 615 (S.D.N.Y. 2015)); *accord Smith*, 619 F. App'x at 876 (complaint must plead "special circumstances" whenever alleged breach stems from fiduciary's failure to act on public information).

*Rinehart* and *Pfeil*—like *Dudenhoeffer*—are grounded in the efficient capital market theory. *See Rinehart*, 817 F.3d at 65-66; *Pfeil*, 806 F.3d at 386. In fact, *Rinehart* declares that "viewing [*Dudenhoeffer*'s] rule as applicable to *all* allegations

of imprudence based upon public information—regardless of whether the allegations are framed in terms of market value or excessive risk—is consistent with the efficient market hypothesis that risk is accounted for in the market price of a security." *Rinehart*, 817 F.3d at 66; *accord Pfeil*, 806 F.3d at 386 (noting that related Modern Portfolio Theory "rests on the understanding that organized securities markets are so efficient at discounting securities prices that the current market price of a security is highly likely already to impound the information that is known or knowable about the future prospects of that security" (quoting JOHN H. LANGBEIN ET AL., PENSION AND EMPLOYEE BENEFIT LAW 634 (5th ed. 2010))); Yadav, *supra* at 1633 (in efficient market, market's most accurate estimate of particular security's value is based on its riskiness and future net income flows investors holding that security are likely to receive). We likewise reject Coburn's claim that risk is attenuated from price such that risk-based allegations are totally free from *Dudenhoeffer*'s constraints.[4] *See Dudenhoeffer*, 134 S. Ct. at 2471. Because a stock price fluctuates, in part, to achieve "the same risk-adjusted expected return as the stocks of the strongest companies," *Cent. Nat'l Bank of Mattoon v. U.S. Dep't of Treasury*, 912 F.2d 897, 901

---

[4] Coburn herself provides ample evidence of the connection between risk and value as, throughout her brief, she argues the risky nature of J.C. Penney stock by highlighting past declines in the *price* of the security. Appellant's Br. 18 ("Even with *ever decreasing stock price value* caused by the Company's continually bad financial performance, Evercore stood on the deck of the sinking ship of J.C. Penney and did precisely nothing to protect the assets of the Plan and its participants . . . ." (emphasis added)); Appellant's Br. 21-22 ("Evercore should have discontinued investment in J.C. Penney stock precisely because *the steady decline of the Company's stock price* 'accurately tracked the company's steadily worsening fortunes.'" (emphasis added)).

(7th Cir. 1990), arguing that a stock is too risky to hold at current market prices is part and parcel of the claim that that stock is overvalued,[5] *see Dudenhoeffer*, 134 S. Ct. at 2471.

---

[5] Coburn's attempt to bypass this reality is unpersuasive. As noted above, stock prices fluctuate to achieve the same expected return as the stocks of the strongest companies in the market. *Cent. Nat'l Bank of Mattoon*, 912 F.2d at 901. This means that, *inter alia*, a "risk discount" is applied to stocks of weaker companies—when a stock becomes increasingly risky (and hence, its potential for loss increases), its price falls so as to maintain the expected market rate of return. *See id.* Here, however, Coburn argues that Evercore could not rely on the market to apply an appropriate "risk discount" because Penney Stock Fund investors had a lower risk tolerance than average market investors. *See* Appellant's Br. 19-21. The investors therefore demanded a *greater* risk discount than the one applied by the market at large and Evercore should have recognized that the market price of J.C. Penney stock constituted an imprudent investment if this more conservative risk discount were applied. *See id.*

Coburn's argument fails, however, because she mischaracterizes the risk tolerance of ESOP investors. "Congress, in seeking to permit and promote ESOPs, was pursuing purposes other than the financial security of plan participants." *Dudenhoeffer*, 134 S. Ct. at 2467-68. Although the alternative purposes are insufficient to create a presumption of prudence on the part of an ESOP fiduciary, *id.* at 2470-71, they nonetheless reflect a clear reality:

> Whatever evils [that exist in ESOPs] are endemic to the ESOP form established by Congress. A benefit of employees investing in their employer is that when the employer does well, the employees do well. A risk is that when the employer goes bankrupt, the employees do poorly.

*Pfeil*, 806 F.3d at 387. Undiversified ESOPs are thus not fairly characterized as "low-risk" investments because of their direct

14

For the foregoing reasons, the judgment of the district court is affirmed.[6]

*So ordered.*

---

relationship to the fortunes of a single company. *Cf.* Terrence R. Chorvat, *Ambiguity and Income Taxation*, 23 CARDOZO L. REV. 617, 630 (2002) (citing RICHARD A. BREALEY & STEWART C. MYERS, PRINCIPLES OF CORPORATE FINANCE 153-56 (1996)) (elementary principle of finance instructs "ceteris paribus, a diversified portfolio of investments has less risk than an undiversified portfolio of stocks"). We therefore reject the premise of Coburn's claim that Evercore should have considered its investors as low risk (i.e., that Evercore should have applied an above-market risk discount) when assessing the prudence of continued investment in J.C. Penney common stock. This conclusion is in accord with *Dudenhoeffer* itself, which—as noted above—rejected the risk-based claims of ESOP investors with a similar risk tolerance. *See supra* at 10-11.

[6] Because we conclude that *Dudenhoeffer* applies to Coburn's claim, we need not reach the question whether, absent *Dudenhoeffer*, Coburn was nonetheless required to allege that J.C. Penney was "no longer viable" in order to survive dismissal. *See* Appellant's Br. 22-23.

ROGERS, *Circuit Judge*, concurring in the judgment. The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, was designed "to protect . . . the interests of participants in employee benefit plans and their beneficiaries." *Id.* § 1001(b). Congress' "massive undertaking," *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44 (1987), followed "almost a decade of studying the Nation's private pension plans," and resulted in a complex and comprehensive statute, *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980), under which every employee benefit plan is to be managed by fiduciaries subject to common law duties of care and specific duties set forth in ERISA, 29 U.S.C. §§ 1102(a), 1104(a)(1). ERISA fiduciaries ordinarily have a duty to diversify investments in retirement plans "so as to minimize the risk of large losses." *Id.* § 1104(a)(1)(C). But employee stock ownership plans ("ESOP") are different. Such plans, which invest "primarily" in the stock of the employer's company, *id.* § 1107(d)(6)(A), are exempt from the diversification requirement, *id.* § 1104(a)(2), and serve multiple purposes, generally to protect employees' retirement savings and also to provide capital growth funds, *see* Tax Reform Act of 1976, § 803(h), 90 Stat. 1590. Despite the risk of undiversified retirement investments acknowledged in ERISA, *see* 29 U.S.C. § 1104(a)(1)(C), Congress has continued to use tax incentives to encourage the creation of ESOPs, *Fifth Third Bancorp v. Dudenhoeffer*, __ U.S. __, 134 S. Ct. 2459, 2469 (2014).

Coburn's purported class action complaint, on behalf of herself as a J.C. Penney ESOP participant and other current and former employees who participated in the J.C. Penney ESOP, alleged that Evercore Trust Company, N.A. ("Evercore"), the J.C. Penney ESOP fiduciary, violated its duty of prudence by failing "to evaluate the merits of the [ESOP's] investments on an ongoing basis and take all necessary steps to ensure that the [ESOP's] assets were invested prudently." Compl. ¶ 67 (Jan.

13, 2015). According to the complaint, given the results of new management initiatives beginning in 2012, Evercore "knew or should have known that [J.C. Penney] stock was not a suitable and appropriate investment for the [ESOP], but was, instead, a highly speculative and risky investment in light of [J.C. Penney's] serious mismanagement and precarious financial condition." *Id.* ¶ 69. Further, it alleged that a loyal and prudent fiduciary would "have in place a regular, systemic procedure for evaluating the prudence of investment in [J.C. Penney] stock." *Id.* ¶ 70. More particularly, the complaint alleged that Evercore should have ceased "to offer [J.C. Penney] stock as an investment option for participant contributions in the [ESOP] when [Evercore] knew that [J.C. Penney] stock no longer was a prudent investment for participants' retirement savings," *id.* ¶ 77, and it "could not possibly have acted prudently when it continued to invest the [ESOP's] assets" in J.C. Penney stock, *id.* ¶ 76.

Opposing Evercore's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), on the ground the complaint "is identical to the claim alleged" and rejected in *Dudenhoeffer*, Mem. in Supp. of Def. Evercore Trust Co. N.A.'s Mot. to Dismiss 6, Apr. 13, 2015 ("Def.'s Motion"), Coburn pointed to the Supreme Court's May 18, 2015 decision in *Tibble v. Edison International*, __ U.S. __, 135 S. Ct. 1823 (2015). She argued not only that *Tibble* "reconfirmed [Evercore's] fiduciary obligations under trust law and ERISA," but that *Dudenhoeffer* "is only relevant in cases where the stock price is alleged to have been artificially inflated," which "is not alleged here." Pl.'s Opp. to Def.'s Mot. to Dismiss 1, 10, June 12, 2015 ("Pl.'s Opposition"). Absent a claim that J.C. Penney stock was either overvalued or undervalued, Coburn asserted she did not need to plead special circumstances in order to survive the motion to dismiss. *Id.* at 10–11. In Coburn's view, *Tibble* "clarified that the duty of prudence under ERISA includes a duty

to continually monitor the prudence of investments of plan assets." *Id.* at 9. Evercore responded that *Tibble* "says nothing about whether Evercore *breached* the duty [to monitor] by failing to foresee the future decline in the price of J.C. Penney stock. . . . *Dudenhoeffer* already resolves this issue." Reply Mem. in Support of Def. Evercore Mot. to Dismiss 2–3, July 13, 2015.

Surprisingly, Coburn does not raise a *Tibble* contention on appeal. *See* Op. 8 n.2; Concurring Op. 1 (Edwards, J.). Consequently, the question before this court is whether *Dudenhoeffer* is dispositive. The Supreme Court has confirmed that the role of ESOP fiduciaries gives rise to the "tension" between the "general duty of prudence" required of ERISA fiduciaries and the authorization of non-diversified, high-risk ESOPs. *Amgen Inc. v. Harris*, __ U.S. __, 136 S. Ct. 758, 759 (2016); *see also Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377, 382–83 (6th Cir. 2015); *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 63–65 (2d Cir. 2016); *Gedek v. Perez*, 66 F. Supp. 3d 368, 372–74 (W.D.N.Y. 2014); Concurring Op. 3–4 (Edwards, J.). But neither the economic theory underlying the appropriate balancing of the duties owed by ESOP fiduciaries, nor the theory of ESOPs, nor the interaction between *Tibble* and *Dudenhoeffer* were briefed on appeal; *Tibble* itself is not mentioned in the briefs. Instead, Coburn places no reliance on economic theory. Her position on appeal is that "[c]ommon law concepts of fiduciary duty . . . cannot be reconciled with [Evercore's] tortured reading which ignores *Dudenhoeffer*'s distinguishable facts that made market efficiency a relevant topic there, but not here." Reply Br. 1. She accepts that Evercore was an independent plan fiduciary with no inside information about J.C. Penney's prospects, *see* Appellant's Br. 11, and focuses on common law obligations where there is a "properly functioning efficient market," Reply Br. 2.

Consequently it behooves the court not to endorse a particular economic theory that could have unforeseen and even unintended consequences in future ERISA litigation, much less in a class action, where the issues are squarely presented and a court must decide them. *See* Op. 6–8, 11–13. The economic theories underlying ERISA, and ESOPs specifically, have been the subject of much scholarship.[1] Although some theories of stock valuation and ESOP fiduciary responsibilities were addressed in the district court, *see, e.g.*, Def.'s Motion 11–13; Pl.'s Opposition 11–13, on appeal the parties' economic analysis is limited to general principles of market efficiency. *See* Appellant's Br. 18–21; Resp't's Br. 11–12, 16–18. Coburn rests her appeal on *Dudenhoeffer*'s "extensive teaching" with respect to the common law of trusts to which she asserts ESOP fiduciaries, no less than other ERISA fiduciaries, are held, Reply Br. 2 (citing *Dudenhoeffer*, 134 S. Ct. at 2465, 2467, 2470), and on the district court opinion in *Gedek* (which was not followed by the Second Circuit Court of Appeals in *Rinehart*, 817 F.3d at 66 n.3). Hence, it is unnecessary for this court to weigh in on the economic theory of ESOPs, much less elaborate upon the economic theory implied by *Dudenhoeffer*. In this complex, technical ERISA context, I would not venture further than is necessary to decide Coburn's appeal, and, as she has presented it, *Dudenhoeffer* is controlling.

The legal theory in Coburn's complaint is based nearly verbatim on the complaint filed in *Dudenhoeffer*. *Compare*

---

[1] For three different analytical approaches to ERISA, *see, e.g.*, Catherine L. Fisk, *Lochner Redux: The Renaissance of Laissez-Faire Contract in the Federal Common Law of Employee Benefits*, 56 OHIO ST. L.J. 153 (1995); Sean M. Anderson, *Risky Retirement Business: How ESOPs Harm the Workers They are Supposed to Help*, 41 LOY. U. CHI. L.J. 1 (2009); Brendan S. Maher & Peter K. Stris, *ERISA & Uncertainty*, 88 WASH. U. L. REV. 433 (2010).

Compl. ¶¶ 67–80 *with* Consol. Class Action Compl. for Violations of the Emp. Ret. Income Sec. Act ¶¶ 228–240, 246–48, *Dudenhoeffer v. Fifth Third Bancorp*, 757 F. Supp. 2d 753 (S.D. Ohio 2010) (No. 08-cv-538) ("*Dudenhoeffer* Compl."). Those theories from the *Dudenhoeffer* complaint were argued in the employees' brief to the Supreme Court. *See* Br. For Resp'ts, *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014) (No. 12-751). The employees urged the Court to conclude, where ESOP fiduciaries "'continued to allow the Plan's investment in Fifth Third Stock even during the time that the stock price was declining in value as a result of [the] collapse of the housing market' . . . that '[a] prudent fiduciary facing similar circumstances would not have stood idly by as the Plan's assets were decimated.'" *Dudenhoeffer*, 134 S. Ct. at 2471 (quoting *Dudenhoeffer* Compl. at 53).

The Supreme Court in *Dudenhoeffer* was thus faced with virtually identical arguments to those Coburn brings to this court. That Court rejected as "implausible" the employees' view that, based solely on publicly available information, a fiduciary's failure to divest from an ESOP whose stock price is declining has violated the duty of prudence, "at least in the absence of special circumstances." *Id.* Coburn urges this court to conclude that *Dudenhoeffer* is inapplicable because her claim is not based on the over- or undervaluation of J.C. Penney stock, but rather that class members' "risk aversion as retirement investors must also be taken into account by a fiduciary when assessing the prudence of continued investment of retirement funds over the long term." Appellant's Br. 14. In her view, "Evercore should have discontinued investment in J.C. Penney stock precisely because the steady decline of the Company's stock price 'accurately tracked the company's steadily worsening fortunes.'" *Id.* at 21–22 (quoting *Gedek*, 66 F. Supp. 3d at 375). In this context, she concludes, no "special circumstances" needed to be pleaded. *Id.* at 14.

Whatever merit there might be to Coburn's risk-aversion contention in the absence of *Dudenhoeffer* — a contention that presumably would require examination of economic theory on types of information incorporated into a stock price, market efficiencies, and the extent of the duty of prudence in the context of ESOPs — *Dudenhoeffer* forecloses the need for such consideration here. Although the employees in *Dudenhoeffer* also argued the employer's stock was overvalued, and that fiduciaries had failed to act on the basis of non-public information, that does not undermine *Dudenhoeffer*'s rejection of arguments as "implausible" that are indistinguishable from those Coburn presents on appeal. 134 S. Ct. at 2471–72. And because *Dudenhoeffer* is dispositive, it is unnecessary to address Coburn's challenge to the district court's alternative holding on *Gedek*, much less to attempt to resolve the tension between *Tibble* and *Dudenhoeffer* or to expound on a possible economic theory of ESOPs.

EDWARDS, *Senior Circuit Judge*, concurring: I do not take issue with anything in the opinion for the court. I write only to emphasize what we do not decide today.

I agree that Coburn's claim of "outsized and unnecessary retirement savings risk" is foreclosed by the Supreme Court's decision in *Fifth Third Bancorp v. Dudenhoeffer*, __ U.S. __, 134 S. Ct. 2459 (2014). I write separately to emphasize that, in affirming the judgment of the District Court, we do not mean to denigrate the viability of a separate "duty to monitor" claim under *Tibble v. Edison International*, __ U.S. __, 135 S. Ct. 1823 (2015). Although Coburn raised a duty to monitor cause of action with the District Court, she failed to preserve the claim and raise it on appeal. It is therefore forfeited.

Coburn raised two separate theories in support of her complaint alleging that Evercore breached its fiduciary duty. First, Coburn claimed that Evercore "knew or should have known that Company stock was not a suitable and appropriate investment for the Plan, but was, instead, a highly speculative and risky investment." Complaint ¶ 69, *reprinted in* Joint Appendix ("J.A.") 24. Second, Coburn claimed that "Evercore Trust failed to engage in proper monitoring of the Company Stock Fund." Complaint ¶ 53, J.A. 20. Specifically, Coburn argued that Evercore "fail[ed] to have in place rudimentary trip wires that would have spurred a prudent fiduciary into action." Complaint ¶ 54, J.A. 20.

Coburn cited facts indicating that J.C. Penney's stock plummeted between 2012 and 2013 because of CEO Ron Johnson's poor management. Johnson's misguided approach, including changes to J.C. Penney's pricing, the "store experience," and the merchandise offered, cost the company stock plan approximately $300 million. *See* Complaint ¶¶ 19–20, 36–37, J.A. 11, 14–15. In the wake of Johnson's firing, analysts described Johnson's reign as "a tumultuous 17

months," Stephanie Clifford, *Chief's Silicon Valley Stardom Quickly Clashed at J.C. Penney*, N.Y. TIMES, Apr. 10, 2013, at A1; "a troubled stint," Daisuke Wakabayashi, *Corporate News: Apple Ex-Retail Chief Leads Startup*, WALL ST. J., Oct. 24, 2014, at B2; and an "abysmal tenure," Sean Williams, *The Motley Fool's Worst CEO of the Year Is . . .*, MOTLEY FOOL (Dec. 12, 2013, 10:05 AM), http://www.fool.com/investing/general/2013/12/12/the-motley-fools-worst-ceo-of-the-year-is-2.aspx. Asked to describe Johnson's performance, a prominent former CEO responded: "There is nothing good to say about what he's done." James Surowiecki, *The Turnaround Trap*, NEW YORKER, Mar. 25, 2013, at 44.

In light of these uncontested facts, Coburn asserted that Evercore did "absolutely nothing," even though its "sole responsibility was to evaluate and monitor the performance of a single equity." Complaint ¶¶ 52, 53, J.A. 19–20. Given the facts and allegations pled, it is hard to comprehend how Coburn's complaint could not survive a motion to dismiss under *Tibble*.

The opinion for the court properly distinguishes, as Coburn did, distinct theories of a breach of fiduciary duty:

> Whereas *Dudenhoeffer* primarily focuses on allegations of misvaluation in the marketplace, *see* 134 S. Ct. at 2471, *Tibble* focuses on the prudence of holding particular investments over time, requiring a fiduciary to "conduct a regular review of its investment with the nature and timing of the review contingent on the circumstances." 135 S. Ct. at 1827–28.

Maj. Op. Part II n.2. These theories are fundamentally different: *Dudenhoeffer* addresses the "over- or undervaluing" of a stock, 134 S. Ct. at 2471; *Tibble*, in turn, addresses the "fail[ure] to properly monitor investments," 135 S. Ct. at 1829. Broadly speaking, *Dudenhoeffer* involves the substance of investment decisions, while *Tibble* has to do with a fiduciary's obligation to monitor those decisions. These theories embrace distinct, albeit not mutually exclusive, causes of action for violations of a fiduciary's duty.

I recognize that the holding in *Tibble* may be in tension with some of what the Court said in *Dudenhoeffer*. Nevertheless, *Tibble* post-dates *Dudenhoeffer*, and it is quite clear in what it says:

> Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset. The Bogert treatise states that "[t]he trustee cannot assume that if investments are legal and proper for retention at the beginning of the trust, or when purchased, they will remain so indefinitely." A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, pp. 145–146 (3d ed. 2009) (Bogert 3d). Rather, the trustee must "systematic[ally] conside[r] all the investments of the trust at regular intervals" to ensure that they are appropriate. Bogert 3d § 684, at 147–148.
>
> . . . .

> In short, under trust law, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones. A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones.

135 S. Ct. at 1828–29 (alterations in original).

It seems plain to me that Appellant's complaint and her argument to the District Court stated a cause of action under *Tibble* that easily should have survived a motion to dismiss. *See Moreno v. Deutsche Bank Americas Holding Corp.*, 15 Civ. 9936, 2016 WL 5957307, at *5–7 (S.D.N.Y. Oct. 13, 2016) (citing *Tibble*, 135 S. Ct. at 1828–29) (denying motion to dismiss a failure to monitor claim); *Northstar Fin. Advisors v. Schwab Invs.*, 135 F. Supp. 3d 1059, 1075–76 (N.D. Cal. 2015) (quoting *Tibble*, 135 S. Ct. at 1828) (same). However, because it is not before us, we have no occasion to address the issue on appeal.